CHANDLER, Justice,
for the Court:
¶ 1. A Pike County jury convicted James Richard Conners Jr. of two counts of murder and two counts of possession of a firearm by a felon. The Circuit Court of Pike County imposed two life sentences for the 'murder convictions and two ten-year sentences for the possession-of-a-firearm-by-a-felon convictions, with all sentences to run consecutively. Conners appeals, arguing that the admission of two forensic reports at his trial violated his right of confrontation under the Sixth Amendment to the United States Constitution and constituted plain error. He also argues that he received ineffective assistance of counsel due to counsel’s failure to make a Confrontation Clause objection to the admission of the forensic reports, and due to counsel’s failure to object to gruesome photographs and evidence of Conners’s past criminal activity and gang affiliation.
¶ 2. This Court finds that the trial court erred by admitting the forensic test reports without live testimony from the analysts who performed the tests, but that the error was harmless. We further find that Conners did not receive ineffective assistance of counsel, because he cannot show that he was prejudiced by any deficient performance by counsel. Therefore, we affirm.

FACTS

¶ 3. On the morning of January 20, 2010, Kathleen Theriot called her grandmother, Sandra Conners. Sandra lived with her husband, Kenneth Conners, and his brother, Conners. The only functional telephone in their trailer was a land line. Although Kathleen lived in Houma, Louisiana, and Sandra lived in Pike County, Mississippi, the two spoke on the phone daily. On this occasion, Sandra told Kathleen she was going to sleep and would call Kathleen back later. However, Sandra never returned Kathleen’s call. Kathleen called Sandra’s house many times that day and the next, with no answer. On January 22, 2010, Kathleen got in touch with a friend’s mother who lived in Pike County, Jennifer Brooks. Brooks agreed to check on Sandra.
*680 ¶ 4. When Brooks arrived, she knocked on the side of the trailer and heard a dog barking inside. When no one came out, she walked around the outside of the trailer. She left and informed Kathleen. Kathleen drove up with her husband and uncle, Albert Touzet, arriving at the trailer at about 4:30 or 5:00 p.m. They noticed that all the occupants’ vehicles were parked outside. Kathleen gave Touzet the set of keys that was kept in a nearby RV, but he was unable to unlock the trailer door. Kathleen and her husband walked around the outside of the trailer, yelling and banging on it. They heard a dog barking inside, the sound of a television, and then the sound of footsteps moving quickly from one side of the trailer to the other. At that point, they called the police.
¶ 5. Lieutenant Mike Milholen with the Pike County Sheriffs Department responded. He walked around the trailer, banged on it, and yelled “Sheriffs Department,” but no one came out. He opened an unlocked window, moved the blinds and curtain, and saw a body in the living room lying beside the front door. Chief Detective Davis Haygood arrived with other officers, and forced entry to the trailer by kicking in the front door. Detective Hay-good testified that the dead bolt of the front door had been locked from the inside.
¶ 6. Once inside, the officers found the bodies of Kenneth and Sandra Conners. Kenneth’s body was just inside the front door. Kenneth had sustained multiple shotgun wounds, including one that almost had severed his neck. Sandra’s body was in the kitchen. She had sustained a single shotgun wound to the back that had severed her spinal cord. The investigating officers determined from the position of Kenneth’s body that it had been moved to that location. They discovered blood under the front porch of the trailer and damage from shotgun blasts both outside and inside the trailer that indicated Kenneth had been shot as he stood in the front door. A sawed-off Mossberg 12-gauge shotgun was found on a table near Kenneth’s body.
¶ 7. The investigators also encountered a chihuahua dog running around the inside of the trailer, barking. Several officers then traveled down a short hallway and through a bedroom door that was tied open with a string. In the room they found Conners lying on a bed watching “Seinfeld” on television. Conners told them that, two days previously, two men from Louisiana had'arrived to buy drugs from Kenneth and Sandra. Conners said he was in his bedroom with the door closed when he heard gunshots. He left his bedroom and encountered one of the men in the hall. The man hit him in the ribs and then in the mouth, dragged him to his room, and forced crushed pills down his throat. Conners stated that he had passed out from the pills and did not awaken until the police broke down the door two days later. Conners was very ill and was sent to the emergency room of a nearby hospital, where he spent several days in the intensive care unit being treated for conditions including low blood pressure, kidney failure, pneumonia, and pancreatitis.
¶ 8. The investigators found a 9mm handgun in a drawer in Conners’s nightstand and many knives located throughout his bedroom. They also found a damp shirt and pair of pants that had been laid out to dry in Conners’s room. Testing did not reveal blood on these items. Testing conducted on wet rags found in a trash can in the kitchen revealed a partial DNA profile. Blood found on the door of Con-ners’s bedroom was determined to be Kenneth’s. A gunshot-residue test of Con-ners’s hands was consistent with gunshot *681 residue, although other sources for the particles could not be excluded. Finally, the officers found a gun case in Conners’s bedroom that was compatible with the 12-gauge shotgun. The case had shotgun shells inside that were found to b'e consistent with several spent shells collected in the living room and kitchen. While there were no fingerprints on the shotgun, DNA was found on the shotgun, and testing showed neither Conners nor Sandra could be excluded.
¶ 9. Two neighbors testified that, at 4:00 p.m. or 5:00 p.m. on the afternoon of the murders, they had heard about four gunshots in rapid succession. They did not call the police, because they thought it was someone hunting. One of these neighbors stated that she had seen Kenneth checking the mail at about 10:30 a.m. or 11:00 a.m. that morning. Kenneth had picked up prescriptions from the pharmacy at 2:00 p.m. on the afternoon of the murders. The defense established that, although several days before the murders, multiple prescriptions for oxycodone and Oxycontin had been filled for Conners and Sandra, no controlled substances were found at the scene.
¶ 10. After Conners’s release from the hospital, he gave a three-hour statement to the police in which he recounted the same version of events he had told at the scene. This tape was played for the jury at trial. Conners first said he had never seen the sawed-off shotgun, but later said he had cleaned it for Kenneth. Conners said that no weapon had ever been stored in the gun case. He stated that he was undergoing pain management treatment with opiate drugs due to several old gunshot wounds and motorcycle injuries. He admitted that he had over-medicated himself on the morning of the murders by taking double his prescribed dose of morphine, along with a muscle relaxer and his blood-pressure medication. He thought the crushed-up drugs that the drug dealers had shoved down his throat had been opiates. When asked if it was possible that he could have committed murders, he said he did not think so.
¶ 11. Throughout his statement, Con-ners was adamant that he had been asleep from the time the drug dealers had departed until being awakened by the police. This contention was undermined by the evidence. Conners said the drug dealers had arrived at 11:30 a.m. or 12:00 p.m., and had stayed for about an hour. However, the State showed that Kenneth had been alive at 2:00 p.m. when he picked up prescriptions, and neighbors had heard gunshots at 4:00 p.m. or 5:00 p.m. The dead bolt had been locked from the inside. Kathleen testified that Conners’s bedroom door was always tied open in the position in which it was found by police, although Conners claimed the drug dealers had shut the door when they left. Conners did not explain why he did not arm himself with the handgun or a knife before leaving his room to confront the armed drug dealers who had just shot his family. Conners was clean-shaven when the police found him, although he claimed he had been asleep for two and a half days. Conners had damp laundry in his room, indicating recent laundering. Kathleen and her family testified they had heard footsteps inside the trailer when they knocked. A neighbor testified she had heard hammering coming from the trailer on January 21, 2010. Investigator Bruce Fairburn testified that, although there was a dog inside the house with Conners, no urine or feces were present, indicating someone had been letting the dog out. Also, photographs of the dog’s full food and water bowls were admitted into evidence. Conners was unable to explain these discrepancies in the interview. His only defense witness was the physician who had treated Conners at *682 the hospital, who testified that he did not see any injuries to Conners’s chest.
¶ 12. The parties stipulated that Con-ners was a prior convicted felon. The jury found Conners guilty of two counts of felon-in-possession-of-a-firearm, based on his possession of the shotgun and the 9-mm handgun. The jury also found Conners guilty of two counts of murder. The trial court granted a directed verdict on a possession-of-stolen-property charge.

LAW AND ANALYSIS

I. WHETHER THE ADMISSION OF FORENSIC REPORTS VIOLATED CONNERS’S RIGHT TO CONFRONTATION.
¶ 13. Conners argues that the admission of two forensic reports in the absence of the analysts who performed the tests violated his Sixth Amendment right to confrontation. During Detective Hay-gdod’s testimony, the State introduced a report of ballistics tests performed by Carl Fullilove of the Mississippi Crime Laboratory. The Mississippi Crime Laboratory had been asked to determine if the spent shell casings found at the murder scene were fired in the Mossberg 12-gauge shotgun also found at the scene. Fullilove’s report stated the following:
The shotgun shells in Submissions 30 through 34 bear some similarities in class characteristics consistent with those produced by the gun in Submission 24. However, the shotgun shells in Submissions 30 through 34 could not be positively included or excluded as having been fired in the gun in Submission 24 to the exclusion of all other firearms bearing the same class characteristics.
Detective Haygood testified that this meant that the shells could have been fired in the Mossberg 12-gauge shotgun or in another one. The State did not call Fulli-love to testify.
¶ 14. Also during Detective Haygood’s testimony, the State introduced a toxicology report of Conners’s blood prepared by Alyssa Purcell of the Mississippi Crime Laboratory. The report stated that Con-ners’s blood had tested positive for caffeine, oxycodone, and metabolite opiates. The State did not call Purcell to testify.
¶ 15. Conners did not object to the admission of either report; therefore, he did not preserve this issue for appellate review, and it thus is procedurally barred. Blanchard v. State, 55 So.3d 1074, 1077 (Miss.2011). Conners argues that this Court should consider this issue under the plain-error doctrine. “Under the plain-error doctrine, we can recognize obvious error which was not properly raised by the defendant ... and which affects a defendant’s ‘fundamental, substantive right.’ ” Smith v. State, 986 So.2d 290, 294 (Miss.2008) (quoting Debrow v. State, 972 So.2d 550, 553 (Miss.2007)). For the plain-error doctrine to apply, there must have been an error that resulted in a manifest miscarriage of justice or “seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.” Brown v. State, 995 So.2d 698 (Miss.2008) (quoting United States v. Atkinson, 297 U.S. 157, 160, 56 S.Ct. 391, 80 L.Ed. 555 (1936)). This Court has held that a Confrontation-Clause violation is a violation of a “fundamental, substantive right.” Therefore, we examine whether a Confrontation-Clause error occurred that resulted in a manifest miscarriage of justice. See Corbin v. State, 74 So.3d 333, 337 (Miss.2011). We conclude that, although a Confrontation-Clause violation occurred at Conners’s trial, because the error was harmless, no manifest miscarriage of justice resulted.
¶ 16. The Sixth Amendment to the United States Constitution states that *683 “[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.” U.S. Const, amend. VI. The Confrontation Clause confers a right to confront “those who ‘bear testimony’ ” against the defendant. Crawford v. Washington, 541 U.S. 36, 51, 124 S.Ct. 1354, 1364, 158 L.Ed.2d 177 (2004). Thus, the testimonial statements of a witness who does not testify at trial are inadmissible unless the witness is unavailable and the defendant had a prior opportunity for cross-examination. Id. at 68, 124 S.Ct. at 1374. “ ‘Testimony,’ ... is typically ‘[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.’ ” Id. (citation omitted). In Crawford, the Supreme Court elaborated on the “core class” of testimonial statements covered by the Confrontation Clause:
Various formulations of this core class of “testimonial” statements exist: “ex parte in-court testimony or its functional equivalent-that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,” ... “extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,” ... “statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,”.... These formulations all share a common nucleus and then define the Clause’s coverage at various levels of abstraction around it.
Id. at 51-52, 124 S.Ct. at 1364 (citations omitted).
¶ 17. In Melendez-Diaz v. Massachusetts, 557 U.S. 305, 129 S.Ct. 2527, 2532, 174 L.Ed.2d 314 (2009), the Supreme Court held that forensic laboratory reports that determined tested substances were cocaine were testimonial and could not be admitted without offering the live testimony by the laboratory analysts. The Court held that the analysts provided “testimony” against the petitioner because they provided one fact necessary for his conviction, which was that the substance he had possessed was cocaine. Id. at 2533. Also, the statements were “made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.” Id. at 2532 (quoting Crawford, 541 U.S. at 52, 124 S.Ct. at 1364). The Court held that “under our decision in Crawford, the analysts’ affidavits were testimonial statements, and the analysts were ‘witnesses’ for purposes of the Sixth Amendment.” Id. “Absent a showing that the analysts were unavailable to testify at trial and that petitioner had a prior opportunity to cross-examine them, petitioner was entitled to ‘be confronted with’ the analysts at trial.” Id. (quoting Crawford, 541 U.S. at 54, 124 S.Ct. at 1365) (emphasis in original).
¶ 18. We note that, in a case decided after Conners’s trial, a plurality of the Supreme Court held that the Confrontation Clause does not allow the prosecution to admit a forensic laboratory report containing a testimonial certification through the in-court testimony of a different analyst than the one who made the certification or performed or observed the test. Bullcoming v. New Mexico, — U.S. —, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011). The Court held that “[t]he accused’s right is to be confronted with the analyst who made the certification, unless that analyst is unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine that particular scientist.” Although Bull-coming was decided after Conners’s trial, *684 it applies retroactively, because Conners’s appeal was pending at the time of decision.[1] See Griffith, v. Kentucky, 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987) (stating that “a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a ‘clear break’ with the past.”).
f 19. Plainly, under Melendez-Diaz, the forensic reports at issue were testimonial in nature. The ballistics report provided “testimony” against Conners by showing that the shotgun shells found at the scene were consistent with having been fired from the shotgun found at the scene. The toxicology report confirmed the presence of controlled substances in Conners’s system. Both forensic tests were performed at the request of the Pike County Sheriffs Department with the results to be used in the prosecution of Conners. The forensic reports were “made under circumstances which would lead an objective witness reasonably to believe that the statements] would be available for use at a later trial.” Melendez-Diaz, 129 S.Ct. at 2532 (quoting Crawford, 541 U.S. at 52, 124 S.Ct. at 1364); see also Hobgood v. State, 926 So.2d 847, 852 (Miss.2006) (stating that, under Crawford, “a statement is testimonial when it is given to the police or individuals working in connection with the police for the purpose of prosecuting the accused”). The analysts were not found to be unavailable, and Conners had no prior opportunity for cross-examination. Because the forensic reports were testimonial in nature, the reports were inadmissible at Conners’s trial absent the analysts’ live testimony, and the admission of the reports violated the Confrontation Clause.
¶ 20. But our inquiry does not end with the determination that a Confrontation-Clause violation occurred. Having determined that Conners’s right to confrontation was violated, we now turn to whether the error resulted in a manifest miscarriage of justice. We conclude that no manifest miscarriage of justice resulted from the error, which was harmless. This Court has recognized that Confrontation-Clause violations are subject to harmless-error analysis. Corbin, 74 So.3d at 338 (citing Delaware v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)). “[A]n otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.” Van Arsdall, 475 U.S. at 681, 106 S.Ct. at 1436. Harmless errors are those “which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction.” Chapman v. California, 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967). In Gossett v. State, 660 So.2d 1285, 1297 (Miss.1995), this Court held that, although a defendant’s right of confrontation was violated when the State introduced an autopsy report without live testimony by the person who had performed the autopsy, the error was harmless beyond a reasonable doubt due to the other evidence of the cause of death and in light of the overwhelming evidence of the defendant’s guilt of murder.
¶ 21. This Court finds that the admission of the ballistics report and the toxieol- *685 ogy report was harmless error. The ballistics report did not determine that the spent shells found at the scene definitely were fired from the shotgun found at the scene. Rather, the ballistics report simply found that the spent shells found at the scene could have been fired in that shotgun, or in another 12-gauge shotgun. This evidence was largely cumulative of other evidence before the jury. Spent shotgun shells and a shotgun were found at the scene; a reasonable inference is that the spent shotgun shells had been fired from the shotgun. Evidence also showed that the spent shotgun shells were of the same type and brand as the shells found in the shotgun case recovered from Conners’s room. Photographs of the spent shells and the shells found in the shotgun case were admitted into evidence, from which the jury reasonably could have drawn this conclusion. The fact that matching shells were found in the shotgun case supported the conclusion that the spent shells had been fired from the shotgun that had been stored in the shotgun case along with the shells. And the toxicology report that showed caffeine, oxycodone, and metabolite opiates in Conners’s blood was consistent with Conners’s theory of defense that the murders had been committed by drug dealers who then shoved opiate drugs down his throat. This evidence was not harmful to the defense case; rather, it bolstered it. The error in admitting the reports in violation of Conners’s right to confront the analysts was harmless beyond a reasonable doubt. Therefore, no manifest miscarriage of justice resulted, and there is no reversible error.
II. WHETHER CONNERS RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL.
¶ 22. With new appellate counsel, Con-ners argues he received ineffective assistance from his two trial attorneys because they (1) failed to object to the forensic reports; (2) failed to object to the admission of gruesome photographs of the victims; and (3) failed to object to evidence about his criminal history and former motorcycle-gang membership. The State argues that the record is factually inadequate to enable this Court’s determination of this issue on direct appeal, and that the issue is appropriate for post-conviction proceedings.
¶ 23. Mississippi Rule of Appellate Procedure 22(b) addresses the propriety of raising the issue of ineffective assistance of counsel on direct appeal. The rule provides:
Issues which may be raised in post-conviction proceedings may also be raised on direct appeal if such issues are based on facts fully apparent from the record. Where the appellant is represented by counsel who did not represent the appellant at trial, the failure to raise such issues on direct appeal shall constitute a waiver barring consideration of the issues in post-conviction proceedings.
M.R.A.P. 22(b). The comment provides:
Rule 22(b) allows the appellant to raise post-conviction issues on direct appeal where the issues are fully apparent from the record of the trial, and failure to raise such issues constitutes a waiver. Under this provision, issues such as claims of ineffective assistance of counsel for failure to object to evidence offered by the state or to argument by the state must be raised on direct appeal. Other post-conviction issues which cannot be raised at the time of appeal because they involve actions or inaction outside the record are not waived since they cannot practically be raised without further development or investigation.
*686 M.R.A.P. 22(b) cmt. The comment specifically states that issues of ineffective assistance of counsel based on counsel’s failure to object must be raised on direct appeal, or they are waived. Conners’s claims of ineffective assistance of counsel all are based on counsel’s failure to make certain objections. These issues are fully apparent from the trial record. Therefore, Con-ners’s ineffective-assistance-of-counsel claims are properly brought on direct appeal. See Neal v. State, 15 So.3d 388, 404-OS (Miss.2009).
¶24. This Court applies the standard from Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), to claims of ineffective assistance of counsel. Williams v. State, 73 So.3d 1125, 1128 (Miss.2011). “There is a strong but rebuttable presumption that trial counsel was competent and performed within the wide range of reasonable conduct expected from counsel.” Knight v. State, 72 So.3d 1056, 1060 (Miss.2011). To rebut this presumption, the burden is on the petitioner to show that (1) counsel’s performance was deficient; and (2) the deficiency prejudiced the petitioner. Id. (quoting Johnson v. State, 29 So.3d 738, 745 (Miss.2009)). Under the prejudice prong, the petitioner must show a “reasonable probability that, but for counsel’s unprofessional errors, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Chamberlin v. State, 55 So.3d 1046, 1050 (Miss.2010) (quoting Mohr v. State, 584 So.2d 426, 430 (Miss.1991)). The “defendant must prove that the ‘deficient performance prejudiced the defense,’ which requires showing that ‘counsel’s errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.’ ” Id. (quoting Strickland, 466 U.S. at 687, 104 S.Ct. at 2052).
¶ 25. All of Conners’s arguments are based upon counsel’s failure to make certain objections. “The failure of counsel to make certain objections may fall within the ambit of trial strategy, and therefore may not give rise to a claim for ineffective assistance of counsel.” Nix v. State, 8 So.3d 141, 144 (Miss.2009). We find that, even if counsel’s failure to object was deficient performance, Conners has not shown that any error was so serious that it denied Conners a fair trial.

A. Failure to object to the forensic reports

¶ 26. As discussed above in Issue I, trial counsel failed to make a Confrontation-Clause objection to the forensic reports introduced during the testimony of Detective Haygood. But Conners has not shown prejudice from the failure to object. This is because, as previously discussed, the admission of these reports into evidence was harmless error that did not deprive Conners of a fair trial.

B. Failure to object to gruesome photographs

¶ 27. Conners complains of counsel’s failure to object to the State’s introduction of thirty-six photographs of the victims’ bodies taken at the crime scene and at the autopsies. These photographs showed the bodies as they were discovered by the investigators, then after they had been moved by investigators, and then at the autopsies after they had been cleaned, with wounds visible. Conners argues that the photographs were gruesome, repetitive, and served no purpose except to inflame the jury’s passions against him.
¶ 28. The admissibility of photographs rests within the trial court’s sound discretion. Jordan v. State, 995 So.2d 94, 110 (Miss.2008). While photographs may have the potential to inflame *687 the emotions of the jury, they are admissible as long as they have an evidentiary purpose. Id. Photographs have an eviden-tiary purpose “when they (1) aid in describing the circumstances of the killing; (2) describe the location of the body and cause of death; (3) supplement or clarify witness testimony.” Id. (quoting Spann v. State, 771 So.2d 883, 885 (Miss.2000)). However, “photographs of the victim should not ordinarily be admitted into evidence where the killing is not contradicted or denied and the corpus delicti and the identity of the deceased have been established.” Id. (quoting Sharp v. State, 446 So.2d 1008, 1009 (Miss.1984)). But, “[r]e-versal for the admission of cumulative and/or gruesome photographs is rare.... ” Barfield v. State, 22 So.3d 1175, 1181 (Miss.2009).
¶ 29. Conners argues that, had trial counsel objected to the admission of the photographs of the victims, the trial court probably would have excluded many of them, because the killing was not contradicted, and the victims’ identities were established. He also argues that several photographs likely would have been excluded as cumulative, and that it was unnecessary to admit photographs from both the crime scene and the autopsies. Con-ners has not shown prejudice from the failure to object. The photographs had an evidentiary purpose, because they aided the State in describing the circumstances of the killing and the location of the bodies and cause of death. They also supplemented and clarified the testimony of the investigating officers and the forensic pathologist who performed the autopsies. The autopsy photographs, which showed the victims’ wounds after they had been cleaned, were not cumulative of the crime-scene photographs, because they more clearly showed the victims’ wounds. And, while the trial court might have excluded some of the photographs after an objection, there is little likelihood that the admission of several additional photographs of the victims so inflamed the jury against Conners as to create a probability that the outcome of his trial would have been different.

C. Failure to object to evidence of Con-ners’s gang affiliation and prior criminal record

¶ 30. Conners’s trial counsel stipulated to Conners’s prior felony convictions. But trial counsel did not object to evidence that came in during his videotaped confession and the testimony of Detective Fairburn about his prior criminal history and former motorcycle-gang membership. During his videotaped confession, which was played for the jury, Con-ners discussed his prior criminal activities and arrests, including that he had been a suspect in a murder case, and that he had served seven years for racketeering. Detective Fairburn related that, at the scene, Conners had told him about his former gang membership and that he had been shot several times in the past. Conners argues that his prior criminal history and gang membership were irrelevant and prejudicial, and that counsel’s failure to object constituted ineffective assistance.
¶ 31. In Sea v. State, 49 So.3d 614, 618 (Miss.2010), Sea argued that his trial counsel was ineffective for introducing Sea’s two prior convictions.for sexual battery at Sea’s sexual battery trial. The two prior convictions were twenty-five and twenty-one years earlier. Id. Under Rule 609 of the Mississippi Rules of Evidence, evidence of convictions more than ten years old is inadmissible absent a specific determination by the trial court that the probative value substantially outweighs the prejudicial effect. M.R.E. 609(b). The Court found that the performance of Sea’s trial counsel was deficient because he had not *688 moved for exclusion of the convictions, but instead had introduced them at Sea’s trial. Sea, 49 So.3d at 618. Further, the Court held that Sea had demonstrated that he was prejudiced. Id. There was no physical evidence of sexual abuse, and the case was based on Sea’s word against that of the children. Id. The Court found that the children’s testimony consisted of “yes” and “no” answers to leading questions by the prosecution. Id. at 618-19. Due to the relative weakness of the case against Sea, this Court held that counsel’s error in introducing the evidence of Sea’s prior convictions had. prejudiced him. Id. at 619.
¶ 32. In contrast with the evidence in Sea, overwhelming evidence of Conners’s guilt was shown at trial. Conners was found in the trailer with the bodies of his brother and sister-in-law, who had been killed with a shotgun. A shotgun was found at the scene, and a shotgun case and shells that matched the spent shells was found in his room. Conners’s theory of defense, that drug dealers had arrived, had committed the murders, had hit him in the chest and face, and then had drugged him, causing him to pass out until the police arrived, was undermined by the physical facts. These included the facts that the deadbolt was locked from the inside, Con-ners had been clean-shaven, the dog inside the trailer with him had fresh food and water and had not eliminated in the trailer, damp laundry was in his room, and Kathleen had heard footsteps inside the trailer. Other facts failed to corroborate Conners’s version of events: he had no visible injuries to his chest or face, and he had not armed himself against the murderous drug dealers despite numerous weapons in his room. Additionally, gunshot residue was found on Conners’s hands. The Court finds that, in light of the overwhelming evidence against Conners, the admission of the irrelevant information about his prior criminal history and gang membership does not undermine confidence in the outcome of his trial. We hold that Conners has not shown that prejudice resulted from counsel’s failure to object; therefore, Con-ners’s claim of ineffective assistance of counsel is without merit.

CONCLUSION

¶ 33. We observe that “ ‘a defendant is entitled to a fair trial but not a perfect one,’ for there are no perfect trials.” Brown v. U.S., 411 U.S. 223, 231-32, 93 S.Ct. 1565, 1570, 36 L.Ed.2d 208 (1973) (quoting Bruton v. U.S., 391 U.S. 123, 135, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476 (1968)). Conners received a fundamentally fair trial. While Conners’s right of confrontation was violated by the admission of forensic test reports without the live testimony of the analysts who performed the tests, this error was harmless. Conners’s claim of ineffective assistance of counsel is without merit because he has not shown prejudice from any of counsel’s alleged errors. Therefore, we affirm the judgment of the Circuit Court of Pike County.
¶ 34. COUNT I: CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT II: CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT III: POSSESSION OF A FIREARM BY A CONVICTED FELON AND SENTENCE OF TEN (10) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT IV: POSSESSION OF A FIREARM BY A CONVICTED FELON AND SENTENCE OF TEN (10) YEARS IN THE CUSTODY OF THE MISSISSIPPI DE *689 PARTMENT OF CORRECTIONS, AFFIRMED. ALL SENTENCES ARE TO RUN CONSECUTIVELY.
WALLER, C. J., CARLSON AND DICKINSON, P.JJ., RANDOLPH, LAMAR, KITCHENS, PIERCE AND KING, JJ., CONCUR. CARLSON, P.J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, C.J., DICKINSON, P.J., RANDOLPH, LAMAR, KITCHENS, CHANDLER AND PIERCE, JJ.

. We note the United States Supreme Court’s recent Confrontation-Clause decision in Williams v. Illinois, — U.S. —, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012). This decision does not affect the outcome of this case.